[Civ. No. 5364. Fourth Dist. Mar. 8, 1957.]

C. EUGENE SMITH, Appellant, v. VERNON R. SMITH et al., Respondents.

*Assigned by Chairman of Judicial Council.

Francis T. Cornish for Appellant.

McCormick, Moock & McCormick for Respondents.

BARNARD, P. J.—This is an action for an accounting, for declaratory relief, and for judgment for the value of plaintiff's interest in a partnership.

The defendant Vernon R. Smith was the sole owner of an olive packing plant and business known as the "V. R. Smith Olive Company." In 1951, desiring relief from some of the burdens of the business because of his age, he formed a partnership with his three sons and allowed them to pay for their interests in the partnership out of the profits, except for an initial gift of $13,000 to each son for that purpose. Articles of copartnership dated April 1, 1951, were executed by Mr. Smith as senior partner, and by the sons Leslie Smith, Raymond Smith, and Eugene Smith as junior partners.

These articles provided, among other things, that the nature and extent of the partnership property should be as shown on the opening books of the partnership, together with later acquired assets; that the fiscal year of the partnership should commence on April 1 of each year; that no partner should terminate his association with the others except by giving three months notice prior to the end of a fiscal year; that the senior partner should have a 55 per cent interest in the partnership and the junior partners should each have a 15 per cent interest; that the partners should receive compensation for their work as agreed upon, such compensation to be considered an expense of the partnership; that full and correct books, accounts and records should be kept; and that at least once each year a statement of the operation of the partnership should be rendered to each partner..

Article 9 provides that if termination of this partnership "shall be caused by one or more, but not all, of the Junior Partners, such act shall not require or cause a winding up of this partnership, but this partnership may be continued by the remaining partners in accordance with the terms hereof, and the withdrawing partner, or partners, shall be entitled to receive, in cash, from said partnership an amount equal to the net book value of his share in said partnership as of date of his withdrawal, such amount to be payable in six equal semi-annual installments, without interest; the first installment being payable six months after date of termination." It further provides that if the senior partner should cause such termination the business shall be wound up, and that the partners shall be paid their interests in the same manner. It was further provided that:

"Net book value of the partnership business shall be the value of all partnership assets and property as fixed, determined and carried upon the books of the partnership, exclusive of any allowance of value for good will and name, less all debts and obligations as may then be owing by the partnership."

The parties also executed another agreement providing for the duties and salaries of the partners. It was agreed that the junior partners should devote all of their time and effort to the business and relieve the senior partner of as many of his duties as he desired; that the senior partner should be free to devote as much time to the business as he desired, but that he was to retain control of the business to the extent he considered necessary for its efficient management; that the salary of V. R. Smith should be $1,000 a month, that of Leslie $650 a month, that of Raymond $550 a month, and that of Eugene $500 a month. It was further provided that the acquisition of the 15 per cent interest of each junior partner had taken place at book value, that V. R. Smith had made gifts to each of the three sons in the amount of $13,000 each, and that the balance of $17,419.43 was payable in three equal annual installments.

The capital of the partnership was contributed entirely by Vernon R. Smith. The partnership books were set up showing certain assets and certain liabilities, with a net value of $237,093.51. There was never any formal transfer of the assets to the partnership or any formal assumption of the liabilities by the partnership, but the business was carried on by the partners as though this had been done. While some

of the provisions of the articles were not strictly complied with, the things done were with the consent of all of the partners and their intentions clearly appear. During the first few months they thus changed the ending of the fiscal year from April 1 to September 30 to correspond with the close of the actual business year, and the first auditor's report and statement of the condition and operation of the partnership was made as of September 30, 1951. A second such report was made as of September 30, 1952, and the final report as of September 30, 1953. These reports were all made by the same firm of certified public accountants although the name of the firm was changed in part as one member of that firm died and another man took his place. The first two reports were made by the man who died, and the last report by the man who took his place, who had worked with him, and who followed the same method of accounting that had been followed from the beginning.

Leslie Smith withdrew from the partnership as of September 30, 1951. No formal documents were executed in that connection but each of the remaining partners acquired one-third of Leslie's interest, and they continued the business. It is undisputed that thereafter V. R. Smith's interest was increased to 60 per cent and the interests of Raymond and Eugene were increased to 20 per cent for each of them. One-third of the amount to be paid Leslie was charged on the books to each of the continuing partners, and when Eugene withdrew from the partnership on September 30, 1953, he still owed $5,588.39 for the additional 5 per cent interest which he acquired when Leslie withdrew. By agreement between the parties the value of Leslie's interest was being paid to him by the partnership at the rate of $400 a month, instead of in six semiannual payments as provided for in the partnership articles. Apparently, the value of that interest was determined as provided for in the articles.

Trouble developed between Eugene and his father in the summer of 1953. The father complained that Eugene refused to do certain work assigned to him; that he absented himself from the business; that he countermanded orders and otherwise interfered with the work of others; and that he called the father a "liar." Eugene complained that his father did not tell him all about the business. The accountant tried unsuccessfully to get them to agree to go on working together. Eugene told the accountant that he wanted to withdraw from the partnership, and the father asked Eugene to withdraw.

On July 18, 1953, the three partners signed a typed statement reading in part: "The partners agree that the partnership is to be dissolved as to the partner Clarence Smith as of September 30, 1953, provided that renewed attempts of all of them do not result in a change of minds. . . . Clarence shall have the option to continue as an employee for three months to December 31 1953 at a salary of $500 per month." The hoped for reconciliation did not take place and Eugene withdrew from the partnership as of September 30, 1953. He remained as an employee for three months for which he was paid $500 per month. This arrangement was made because Eugene needed something to live on, as it was then too late to get a job teaching school. He had formerly been a schoolteacher, his salary being $180 a month a year or two before this partnership was formed. The remaining partners started to pay Eugene for his interest in the partnership by paying him $400 on January 1, 1954, and $400 on February 1, apparently with the idea of doing the same as they were doing with Leslie. Eugene became dissatisfied, a controversy arose, and this action was brought on May 5, 1954.

The action was partially tried on two days in November, 1954, whereupon it was continued at the plaintiff's request for the purpose of giving a certain auditor an opportunity to examine the books and records of the partnership. The trial was resumed in April, 1955. At the outset of that hearing the question was asked as to whether the plaintiff had examined the books of the partnership and plaintiff's counsel replied "We have not." The trial then continued for three days.

The auditor's report as of September 30, 1953, stated that the net book value of Eugene's interest in the partnership as it appeared on the books amounted to $39,912.72. Among other things, the court found that this audit report on the books of the partnership is correct and accurate, except as it reflects the situation with respect to an automobile which was retained by the plaintiff, and that this discrepancy was caused by the plaintiff. After making the proper correction in this connection the court found that the plaintiff's share in the net book value of the partnership was $38,785.69; that from this amount should be deducted one-third of the balance still owed by the partnership to Leslie Smith for the purchase of his interest; that this amount should be further reduced by $694.15, being the plaintiff's 20 per cent share of the cost of the audit of the partnership books as of September

30, 1953; and that it should be further reduced by the $800 which had already been paid the plaintiff. It was further found that the parties agreed on July 18, 1953, that the partnership would be dissolved as of September 30, 1953, under the provisions of article 9 of the articles of copartnership, and it was terminated under the terms of that agreement; that this termination was caused by the plaintiff; that it is not true that the defendants ever prevented the plaintiff from participating in the business of the partnership; and that it is not true that they ever prevented him from having access to the books of the partnership, or withheld any information from him regarding the financial condition of the partnership or the partnership books and records. Judgment was entered accordingly awarding the plaintiff $31,703.14, payable in six semiannual installments commencing April 1, 1954, with interest after each installment became or becomes due. The plaintiff has appealed from this judgment.

At the conclusion of the trial the matter was submitted to the court on briefs. In his brief the plaintiff argued that he was entitled to the actual cash value of his interest in the partnership, instead of the net book value shown on the books. He stated that he was willing to accept the report and statement of the accountant for the purpose of determining the value of his interest, but argued that the value of his interest as thus shown should be increased by adding certain items in order to show ''the actual value instead of book value.'' As to the amount that should be awarded him, the main contentions here made are with respect to three of the additions for which the plaintiff contended in the trial court, and as to which the court held against him.

 The appellant's first contention is that he was entitled to the actual value of his interest in the partnership on the date of his withdrawal, that this amount was due at that time, and that he was entitled to interest thereon from that date. It is argued that the partnership was dissolved as to him by mutual consent under the agreement of July 18, 1953, and not under the terms of the partnership agreement; that September 30 was not the end of the fiscal year as fixed by the articles and three months' notice was not given; that since the articles of copartnership made no provision for a dissolution by mutual consent the general corporation law of the state governs, and the provisions of the articles as to how his interest should be arrived at, or how paid, should not be considered; and that the court's finding to the effect that the part-

nership was dissolved as to the appellant under the terms of the partnership agreement is not sustained by the evidence. While the ''agreement'' of July 18 was signed by the parties a little less than three months before the end of the fiscal year, as changed and acted on throughout the partnership, it clearly appears from the language there used and the conduct of the parties that the agreement of July 18 was intended merely to provide for a termination as to Eugene at a certain date, and that it was not intended to change or affect the provisions of the articles with respect to how that dissolution should be accomplished or how the value of his interest should be determined. That this was also the appellant's understanding is sufficiently shown by his complaint, to which he attached a copy of the articles of copartnership, and in which he alleged ''that pursuant to the terms and provisions of'' the partnership agreement there became due to him on March 31, 1954, an amount equal to one-sixth of his interest in the partnership, and that there would become due to him on each September 30 and March 31 thereafter up to September 30, 1956, an amount equal to one-sixth of the value of his interest. In the prayer of his complaint he prayed that the value of his interest in the partnership be ascertained and that he have judgment for that amount, payable in six installments in accordance with the above allegation of his complaint. The court's findings in this regard are in accord with the partnership agreement and the allegations and prayer of the complaint, and conform with the intention of the parties as disclosed by the evidence. While the evidence supports the finding that the dissolution as to the appellant was caused by him it makes no practical difference whether it was caused by him or by his father, since under the terms of the partnership agreement the appellant is entitled to the same relief in either event.

It is further contended that the audit and report of September 30, 1953, which was adopted and used by the court, was not a true, correct or accurate report and did not correctly set forth the value of appellant's interest in the partnership; that it was not prepared in accordance with the best established methods of accounting; and that it resulted in four errors in determining the value of appellant's interest, only one of which was corrected by the trial court, that being the one in connection with the automobile. This audit was prepared before any controversy arose as to how payment should be made to the appellant. It was prepared by an estab-

lished firm of certified public accountants, and the same methods of accounting were followed as had been used in each of the preceding accounts and reports for the previous fiscal periods. It was supported in all respects by the testimony of the accountant who prepared it. A certified public accountant who was called by the appellant testified that he could not say that the account was wrong in any particular, that there were some things in it that he would like to ask questions about, and that he thought this report "was probably as accurate as could be made at that time." The finding that this audit report of the books of the partnership as of September 30, 1953, is correct and accurate, except for the matter of the automobile which was corrected, is sustained by the evidence.

The first of the errors in accounting claimed by the appellant is in respect to the percentage used in reducing the value at which finished goods were carried or shown on the inventory on the books of the partnership for that year. The inventory showed a certain amount of finished goods on hand, and in valuing these goods on the audit report the auditor reduced the inventory figure by 30 per cent. It was conceded by everyone, including all of the accountants who testified, that some such reduction should be made to cover anticipated costs of selling and other charges properly to be considered in that connection. One accountant who testified for the appellant testified that he would have used a reduction figure of 25.34 per cent instead of 30 per cent, and that he based this on the experience shown by the profit and loss sheet of the preceding year. While this witness testified that under good accounting practice "Your past year's experience would be about the best thing to go by," he also testified that "Of course, it would be adjusted by the field of the market at that particular time," and that what would be done would vary according to whether you were going into an "up market" or a "down market." The accountant who prepared the report testified that in arriving at the 30 per cent he took into consideration the experience of the last three years and, after making an inquiry as to the various items of expense, tried to come as near as possible to the probable costs and proper charges. The preceding year a figure of 28 per cent was used and in the 1951 report 40 per cent was used. An accountant called by the appellant testified that on the figures shown on the inventory an allowance of 32.17 per cent would not be out of line and that "I would say that some-

where in that neighborhood would be probably a fair figure.'' If in making this deduction the figure of 25.34 per cent had been used instead of 30 per cent it would have added about $5,000 to the amount to which the appellant would be entitled. However, the evidence in this regard, although conflicting, sufficiently sustains the finding made.

It is next contended that the audit report failed to include an amount covering prepaid freight and storage charges on certain finished goods which were stored in outside warehouses, which amount would probably be later collected. It is argued that about $200,000 worth of goods were stored in warehouses back east on which freight and some storage charges had already been paid; that the practice was to add such charges to the selling price when the goods were sold; that on $21,000 worth of goods which were actually sold about $2,500 was thus added to the selling price; that on a similar basis the value of all the goods stored in outside warehouses would probably be increased by about $25,000; that these ''recapturable'' freight and storage charges were an asset which should have been included in the audit report; and that the appellant's recovery should have been increased by about $5,000. While it was the usual practice to add such freight and storage charges to the price of the goods when sold, no one could tell in advance what the total selling price of the goods would be, and further storage and possible freight charges might well be incurred. Both the amount of any recapturable charges and the prices that would ultimately be received for the goods were unknown at the time in question. These goods were carried on the books at their estimated value, which was all that could be done. The partnership agreement provided for a settlement on the basis of the assets as shown on the books at the time of withdrawal of a member, and no such anticipated asset could logically be, or was, shown on the books at that time. No such asset had been shown on the books during any previous year, and if such a change in the method of keeping books should now be made it should logically relate back to the beginning of the partnership, with a corresponding increase in the cost of the appellant's interest therein. Under the facts and circumstances shown by the record, and in view of the agreement of the parties and their conduct, the court was justified in refusing to include this as an existing asset shown on the books of the partnership.

It is next contended that error appears in the auditor's report in that the full book value of certain corporate stock

was not included as an asset of the partnership. It appears in this connection that V. R. Smith owned all of the stock of a corporation known as "Associated Olive Oil Company," this being one of the assets which he turned over to the partnership. The stock had cost Mr. Smith $20,000. On October 1, 1950, six months before the partnership was formed this stock had a book value on the books of the corporation of only $13,985.74. On September 30, 1951, six months after the partnership was formed it had a book value of $13,755.45. When the books of the partnership were opened this stock was given its cost value of $20,000, and it has always been carried on the books of the partnership at that value. However, it has been listed as an asset under the heading of the "Investment in" that corporation, and by adding to the $20,000 the amount advanced to the corporation, deducting the amount currently owed by the partnership to the corporation for olive oil purchased, and listing the net amount as an asset. While the auditor's report here in question stated that the book value of this stock was $34,301.27, the investment in the corporation was listed as an asset of $24,253.25, being $20,000 plus advances of $16,200 and less $11,946.75 currently owed to the corporation. The appellant contends that the book value of this stock had increased by $20,315.53 since October 1, 1950 (six months before the partnership was formed), and that he is entitled to one-fifth of that increase. It appears that the book value of this corporate stock had fluctuated considerably from time to time. The corporation was handled as a separate business, and on the books of the partnership its actual investment in the corporation was carried as one of the assets. A public accountant, who testified for the appellant, testified that on an equitable basis the increase in the book value of the stock might well be considered as a profit, but that the matter could properly be carried on the books of the partnership in either of two ways, by carrying it at its cost value or by "earmarking" an increased value of $14,000. The total investment in the corporation was carried on the books of the partnership as an asset at all times, and the agreement provided for a division of the assets as shown on the books. The court was justified in accepting the auditor's report in this connection.

█ It is further contended that the court erroneously charged the appellant with 20 per cent of the cost of preparation of the auditor's report and statement of September 30, 1953. It is argued that a retiring partner ought not to be

charged with the cost of determining the value of his interest and that, if the articles of copartnership are considered, the expense of preparing this statement was an obligation which the partnership incurred after September 30, 1953. The articles of copartnership provided that full books and accounts should be kept showing the partnership business, and that at least once a year a statement of the operation of the partnership should be furnished to each partner. A regular auditor was hired and this was the third of such audits and reports which were regularly made. Although a large part of the work of preparing this report may have been done after September 30, 1953, the obligation to prepare this report existed before that date, with a corresponding obligation to pay for it.

No error appears in the court's refusal to grant the appellant's request for permission to inspect the partnership books in connection with transactions after September 30, 1953, since under the agreement the value of his interest was to be determined by the net book value as of that date. The appellant argues at some length about another obligation which was in fact assumed by the partnership, although he admits that this point should not be considered. We are not impressed with the argument that the judgment appears inequitable since the appellant paid $38,869 for his interest in the partnership and the court found that he should be allowed only $32,503, of which he had already been paid $800. The court found that he was entitled to $39,912 less certain amounts for which he was still obligated. While he put no money into the partnership, except for $900 toward the purchase price of a $3,150 automobile which he retained, he has received $49,753, including salary, the automobile and the judgment, for his two and one-half years' work in the partnership business. He entered the partnership under an agreement which provided how the value of his interest would be determined. The evidence supports the court's findings, and its refusal to adopt another and different method of determining the value of that interest.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied April 1, 1957, and appellant's petition for a hearing by the Supreme Court was denied May 1, 1957.